IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MELISSA SWEETEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  3:11-CV-934-G (BH) |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to *Special Order No. 3-251,* this case was automatically referred for determination of non-dispositive motions and issuance of findings, conclusions, and recommendations on dispositive motions.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed July 31, 2011 (doc. 17), and *Response to Plaintiff's Motion and Cross-Motion for Summary Judgment*, filed August 30, 2011 (doc. 18).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED,** the Commissioner's cross-motion should be **GRANTED**, and the final decision of the Commissioner should be **AFFIRMED**.

## I.  BACKGROUND[1]

### A.  Procedural History

Melissa Sweeten (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability benefits under Title II of the Social Security Act and for supplemental security income payments under Title XVI.  (R. at 10.)  While a resident of Arkansas, Plaintiff applied for supplemental security income and disability

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

insurance benefits on May 23, 2007, alleging disability beginning January 5, 2007, due to back injury, arthritis, depression, "defective heart", chest pain, and back pain. (R. at 134, 173, 185.) Her claims were denied initially and upon reconsideration. (R. at 64-67, 80-86, 88-91.) Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on January 6, 2009, in Portsmouth, Arkansas. (R. at 13-59.) On May 14, 2009, the ALJ issued a decision finding Plaintiff not disabled. (R. at 68-79.) Plaintiff appealed, and the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-3.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (*See* doc. 1.)

**B. Factual History**

**1. Age, Education, and Work Experience**

Plaintiff was born in 1968. (R. at 19.) She finished high school and has past relevant work experience as a customer service representative, an appointment scheduler, a grill cook, and a waitress. (R. at 23-27.)

**2. Medical Evidence**

***a. Evidence Before the ALJ***

On January 8, 2006, Plaintiff went to Summit Medical Center in Van Buren, Arkansas complaining of chest pain. (R. at 280-84.) On January 9, 2006, upon examination, Javed Rana, M.D., noted that Plaintiff had appropriate "contents of thought", organized judgment and insight, no "Flight of ideas/Loosening of association/Preservation", and no signs of depression or anxiety. (R. at 278-79.) Dr. Rana ordered labs, including an EKG and CT scan. (R. at 279.) Plaintiff's chest x-rays showed she had bibasilar interstitial pneumonia. (R. at 302.)

On January 10, 2006, Plaintiff had an echocardiogram that showed her heart chamber was of normal size with a normal wall motion, and normal left ventricular systolic function with a normal ejection fraction that was estimated at 60%.  (R. at 294-95.)  She also had a small echodense structure in the right atrial cavity, which the doctor opined was either a cardiac tumor or an organized intracardiac thrombus.  (*Id.*)  The doctor recommended a transesophageal echocardiogram for a better assessment of the intracardiac mass.  (R. at 295.)  A chest x-ray performed that day revealed that infliltrates present the day before had resolved with no evidence of acute process, and both a "nuclear medicine ventilation" and "perfusion study" yielded normal results.  (R. at 296, 298.)

On January 11, 2006, Plaintiff received a transesophageal echocardiogram.  (R. at 293.)  Joni Carmack, M.D., noted that the test revealed an intracardiac mass with an intra-atrial membrane that was mildly calcified in some areas.  (*Id.*)  She also noted that the mass was probably an embryonic remnant and was very unlikely to represent either a tumor or an intracardiac clot.  (*Id.*)  She recommended a follow-up echocardiogram in six months.  (*Id.*)

On May 2, 2006, Plaintiff visited Summit Medical Center with complaints of atraumatic chest pain.  (R. at 258-60.)  She weighed 136.4 kilograms (300 pounds) at that visit.  (R. at 259.)  David Albers, M.D., noted that Plaintiff's "regional skeleton, heart, lungs, mediastinum, and pulmonary vessels were normal."  (R. at 256.)  Steve Nelson, M.D., diagnosed Plaintiff with gastroesophageal reflux disease (GERD) and chest wall pain.  (R. at 259-60.)

On November 11, 2006, Plaintiff visited Summit Medical Center complaining of atraumatic chest pain.  (R. at 247-57.)  Plaintiff reported to Dr. Carmack that she was on her way to work when she felt a sharp pain radiating forward in her right shoulder lasting less than two minutes.  (R. at 248.)  She indicated that the shoulder pain was resolved but complained of chest pain and shortness

of breath. (*Id.*) Dr. Carmack noted that Plaintiff was alert and oriented, but appeared anxious. (R. at 249.) Her chest x-rays were normal, and she was diagnosed with reflux and chest wall pain and prescribed Pepcid. (R. at 249, 256.)

On March 19, 2007, Plaintiff visited Summit Medical Center again with complaints of chest pain. (R. at 233-46.) She displayed cardiovascular chest pain and shortness of breath but did not appear anxious or depressed. (R. at 234.) Plaintiff's recorded weight was 120.5 kilograms (265 pounds). (R. at 234, 237.) Her physical examination revealed that she was alert and oriented with normal mood and affect, and her chest x-rays were within normal limits. (R. at 235, 246.) The treating physician diagnosed Plaintiff with reflux and prescribed Pepcid. (R. at 235.)

On July 15, 2007, Plaintiff sought treatment for right shoulder pain, numbness on the left side of her face, and trouble breathing. (R. at 318-21.) She weighed 275 pounds that day. (R. at 319.) Upon physical examination, she appeared alert, oriented, tearful, and anxious, but she did not exhibit depression. (R. at 320.) Dr. Stephen Graves diagnosed her with "hyperventilation/anxiety" and bronchitis, and he prescribed Ativan. (R. at 319-21, 324.)

On November 19, 2008, Plaintiff went to Parkland Hospital in Dallas, Texas, complaining of chest pain and low back discomfort due to herniated discs. (R. at 630.) She appeared anxious and diaphoretic, was crying, and complained of shortness of breath. (*Id.*) Upon physical examination, she was found to be oriented but distressed. (*Id.*) She had normal range of motion of the neck and musculoskeletal system. (R. at 634.) She displayed normal mood and affect, normal behavior, and normal judgment and thought content. (*Id.*) She was treated with morphine, which resolved her chest pain. (R. at 626.)

On December 9, 2008, Plaintiff received an EKG at Parkland hospital after complaining of

back pain that radiated to her neck.  (R. at 626.)  She was given pain medication and moved to a room for assessment.  (*Id*.)  She was later observed sleeping in her room with no distress and even and unlabored breathing.  (R. at 620.)  Several hours after being moved to a room, Plaintiff indicated she wanted to leave the hospital and return at a less busy time.  (*Id*.)  She was in no distress and walked out of the ER with a steady gait.  (*Id*.)

### b. Additional Evidence From Between the Hearing and the ALJ's Decision

On March 7, 2009, Plaintiff visited Parkland Hospital complaining of chest and back pain. (R. at 614.)  A physical examination revealed that she did not have myalgia, neck pain, or joint pain. (R. at 616.)  Her symptoms were positive for depression and negative for suicidal ideas.  (*Id*.) Plaintiff had lower back tenderness to palpation along the vertebrae, no edema, upper extremity strength of "5/5", and lower extremity strength limited by pain.  (R. at 618.)  She appeared alert and oriented, but tearful.  (*Id*.)  Plaintiff's chest pain was not relieved by Nitroglycerin and was found to be more consistent with musculoskeletal issues than myocardial infarction.  (*Id*.)

On March 29, 2009, Plaintiff returned to Parkland Hospital complaining of chest pain radiating to her back and arm.  (R. at 604.)  She was noted to be oriented with no distress, but tearful.  (R. at 606.)  Plaintiff had no myalgia, neck pain, dizziness, or tingling.  (*Id*.)  She had normal range of motion, normal reflexes, normal muscle tone, and normal coordination with no edema or tenderness.  (*Id*.)  After reviewing results of her EKG, Linda Gregory, D.O., found Plaintiff within normal limits and stable for discharge.  (R. at 598.)  She was given medication that decreased her pain and discharged.  (R. at 598, 600-02.)

On April 22, 2009, Plaintiff underwent an MRI of the thoracic and lumbar spine due to back pain radiating to her knees.  (R. at 774.)  The MRI demonstrated that she had multilevel disc

5

desiccation and disc bulges of the thoracic spine and degenerative disc desiccation at L4-L5 and L5-S1, with no disc bulge or protrusion, no narrow signal abnormalities, and no stenosis in the lumbar spine.  (R. at 774, 790, 794.)

On April 28, 2009, Plaintiff visited Parkland Hospital complaining of chest pain.  (R. at 588.) Upon examination, she appeared oriented, alert, and tearful, with appropriate thought content.  (R. at 584, 592.)  She exhibited normal range of motion of the musculoskeletal system with no edema. (R. at 592.)  She was admitted to the hospital and underwent cardiac catheterization that revealed no significant coronary artery disease.  (R. at 658-660.)  She was discharged on May 1, 2009, with the principal diagnosis of non-cardiac chest pain, and secondary diagnoses of obesity, hypertension, hyperlipidemia, degenerative joint disease, migraines, and asthma.  (R. at 658-660.)  She was instructed to pursue pulmonary care for her shortness of breath, encouraged to stop smoking, and to lose weight.  (*Id*.)  Plaintiff was released with a prescription for Zantac and recommendations for smoking cessation, a cardiac diet, and no heavy lifting for one week.  (R. at 566.)  No other work related or daily activity restrictions were given.  (*Id*.)

### 3.  Hearing Testimony

On January 6, 2009, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ in Portsmouth, Arkansas.  (R. at 13-59.)  Plaintiff was represented by her attorney. (R. at 15.)

#### a.  *Plaintiff's Testimony*

Plaintiff testified that she was forty years old, had a high school degree, was separated from her husband, and lived with friends.  (R. at 19, 44-45, 50.)  She had four children, a 20-year-old that was living with the father, and three younger children who had been adopted and whose whereabouts she did not know.  (R. at 51.)  She testified that she had prior work experience in

6

telemarketing customer service and as a waitress, and had last worked in 2006 as a grill cook.  (R. at 22-25.)

Plaintiff testified that she had three herniated discs in her lower back that made it painful to sit, stand, lay, or walk for more than five minutes at a time without having to move.  (R. at 28.)  She was informed about this condition at Baylor in Dallas, Texas, in 2000, but could not recall the name of the doctor who treated her for that condition.  (R. at 28-29.)  Plaintiff testified that she hurt her back while working at Walmart after lifting a heavy box containing weights.  (R. at 40.)  She filed a worker's compensation claim and was off work for 8 to 10 weeks.  (*Id.*)  She attended physical therapy and saw a back doctor who told her that she might need surgery.  (*Id.*)  After she was fired by Walmart for failing to clock out for lunch, however, the doctor told her that she did not need surgery.  (R. at 41.)  Plaintiff's lower back pain worsened when it was cold and damp.  (R. at 43-45.)  She was unable to "do anything" for herself, including standing long enough to cook, getting in and out of the bath tub, or performing house work such as sweeping and mopping.  (*Id.*)  She was also unable to bend over to tie her shoes and needed help to dress herself.  (R. at 51-52.)

Plaintiff stated that she also had a heart condition.  (R. at 30.)  She went to Summit in January 2006 for chest pains and was given a transesophageal ecocardiogram and two sonograms because the doctors believed she had a "clot".  (R. at 30-31.)  She was treated at the Dallas Regional Medical Center in Mesquite, Texas, for an "extra flap in [her] heart that cause[d] [her] problems" and was taking aspirin and blood pressure medication twice a day for that condition.  (R. at 32.)  She also had an "enlarged interior superficial vein that was tender on exam", and her doctor had recommended that she contact a vascular surgeon to have that repaired.  (R. at 33.)  Plaintiff planned to see a vascular surgeon in Dallas regarding that condition.  (*Id.*)  She also had obesity issues, was

5'7" tall and weighed 325 pounds, and had gained 50 to 60 pounds since January 2007.  (R. at 34.)

Plaintiff had been diagnosed with anxiety issues but believed she had depression more than anxiety.

(R. at 34-35.)  She stated that it was painful to be on her feet, she was stressed out all the time, and

she wanted to die.  (R. at 35.)  Plaintiff testified that she was taking aspirin, Omeprazole for her

stomach issues, Phenergan for nausea, Ibuprofen for inflamation, Vicodin for pain, Meloxicam to

relax muscles, Metoprolol for her blood pressure, Furosemide to remove fluid from around the

enlarged vein in her leg, and Nitroglycerin.  (R. at 37, 42-43.)

Plaintiff acknowledged that when she filled out her disability application in June 2007, she

had indicated that she was able to use a computer, take care of herself, do household chores, fix

food, drive, walk, shop, and handle money.  (R. at 44-45.)  She had also noted that she could only

lift about 5 pounds, and that she believed she could walk a quarter of a mile before needing to rest

for 15 to 30 minutes.  (*Id.*)  At the time of the hearing, however, Plaintiff indicated she could only

sit comfortably for 5 to 10 minutes before feeling pain and needing to move around.  (R. at 46.)  She

stated that she had taken an 11-hour bus ride to Dallas in October 2008 that was very painful and

during which she frequently stood.  (R. at 38, 46-47.)  She had difficulty getting from the parking

garage to the hearing location because she had not taken her pain medication, which made her

groggy.  (R. at 47-48.)  She only drove in emergencies, but did drive on the way from Dallas to

Arkansas for the hearing while her mother was napping.  (R. at 48.)

### b.  VE Testimony

The VE characterized Plaintiff's prior job as a customer service clerk as sedentary in exertion

and semi-skilled, her job as a grill cook as medium in exertion and skilled, and her job as a waitress

as light in exertion and semi-skilled.  (R. at 26-27.)  The ALJ asked the VE to opine whether a

8

hypothetical individual could perform work at a light exertional level with the following limitations: no climbing of scaffolds, ladders or ropes; occasional climbing of ramps or stairs, stooping, bending, crouching, crawling, kneeling, and balancing; no sustained driving; and no work at unprotected heights or around dangerous equipment or machinery.  (R. at 52-53.)  The ALJ explained that the work should be non-complex and "routine repetitive type" work that can be learned by rote, should require simple instructions and little judgment, should have few variables; and should have "[s]uperficial contact incidental to work with the public and coworkers," and concrete, direct, and specific supervision.  (R. at 53.)  The VE opined that the hypothetical person could not perform any of Plaintiff's past relevant work, but could perform light, unskilled work, such as that of a poultry deboner and poultry eviscerator (6,000 positions in Arkansas and an estimated 140,000 in the national economy), and of a "laundry and related worker" (1,100 positions in Arkansas and an estimated 82,000 in the national economy).  (R. at 53-54.)

The ALJ asked the VE to opine whether the positions of poultry deboner, poultry eviscerator, and laundry and related worker positions would be within the RFC of the hypothetical individual if the individual was limited to the sedentary level with the same postural, environmental, and mental limits already provided.  (R. at 54-55.)  The VE stated the positions would not be available to the hypothetical individual at the sedentary level, but that the positions of surveillance system monitor (300 positions in Arkansas and an estimated 34,000 in the national economy), and "inspectors, sorters, and weighers" (1,000 positions in Arkansas and an estimated 68,000 in the national economy) would be available.  (*Id.*)  The ALJ then asked the VE if adding a need for extra breaks lasting anywhere from 15 minutes to 30 minutes at a time, adding up to 1 to 1 ½ hours a day — secondary to pain, fatigue, medication side effects, and lack of restorative sleep — would have

any effect on the listed occupations at either the light or sedentary unskilled level.  (R. at 55-56.)

The VE testified that these limitations would eliminate the jobs at both the light and sedentary

unskilled level, and that there would be no other positions available.  (R. at 56.)  The ALJ asked

what the effect would be if instead of needing extra breaks, the individual would miss work an

average of two times a month.  (*Id.*)  The VE again responded that it would eliminate the positions,

and that there would be no other positions available.  (*Id.*)  Finally, the ALJ asked whether the light

and sedentary jobs would be available if instead of extra breaks, the hypothetical individual would

be off pace one third of the time.  (*Id.*)  The VE responded that it would eliminate all the positions

he had listed.  (R. at 56-57.)

### C. ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on May 14,

2009.  (R. at 79.)  At step 1, the ALJ determined that Plaintiff met the insured status requirements

through March 31, 2010, and had not engaged in substantial gainful activity since January 5, 2007,

the alleged date of onset of disability.  (R. at 73.)  At step 2, the ALJ found that Plaintiff suffered

from severe impairments, including GERD and obesity.  (*Id.*)  At step 3, the ALJ determined that

Plaintiff had no impairment, or combination of impairments that met or equaled the requirements

of any listed impairment in the regulations for presumptive disability.  (*Id.*)  The ALJ found that

Plaintiff had the residual functional capacity (RFC) to perform light work with the following

limitations: she could not climb scaffolds, ladders, or ropes; she could only occasionally climb

ramps and stairs, stoop, bend, crouch, crawl, kneel and balance; she could not work at unprotected

heights or near dangerous machinery or equipment; she could not perform sustained driving;

secondary to pain and obesity, she was moderately limited in the performance of activities of daily

living; secondary to pain and the side effects of medications, she was moderately limited in social functioning as well as concentration, persistence, and pace; she was able to perform work where interpersonal contact with the public and co-workers was superficial and incidental to work performed; where she was required to complete non-complex, routine, repetitive tasks with simple instructions requiring little judgment, complexity of tasks was learned and performed by rote, with few variables and little judgment, and supervision was simple, direct, and concrete.  (*Id.*)  At step 4, the ALJ determined that Plaintiff was unable able to perform any of her past relevant work.  (R. at 77.)  At step 5, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy.  (R. at 78.)  The ALJ concluded that Plaintiff was not under a disability from January 5, 2007, through the date of the decision.  (*Id.*)

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g.)  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id.* at 436 & n.1.

### 2.  Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at Step Five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3. Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and remand the case solely for calculation and awarding of benefits.  (*See* Pl. Br. at 15-16.)  When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009).  The claimant must carry "the very high burden of establishing 'disability without any doubt.'"  *Id.* at *11 (citation omitted).  Inconsistencies and unresolved issues in the record preclude an immediate award of benefits.  *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005).  The Commissioner, not the court, resolves evidentiary conflicts.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B. <u>Issues for Review</u>

Plaintiff raises the following issues for review:

1. Did the Commissioner apply the proper standard to evaluate severe impairments, as required in this Circuit;

2. Did the Commissioner properly evaluate all of Plaintiff's medically determinable impairments;

3. Having found that the Plaintiff cannot return to her past relevant work, did the Commissioner carry his burden at step 5 of the sequential evaluation of disability by identifying other work, in significant numbers, which Plaintiff can perform considering all of the impairments recognized by the Commissioner; and

4. Did the Commissioner properly evaluate credibility.

(Pl. Br. at 1-2.)

### C. <u>Issue One: *Stone* Standard</u>

Plaintiff contends that the ALJ failed to utilize the proper severity standard set forth in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985).  (Pl. Br. at 10-12.)  She argues that the ALJ

14

failed to cite to *Stone* or use the correct standard of severity in her decision. (*Id*.)

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(C).  The Fifth Circuit has held that a literal application of these regulations would be inconsistent with the Social Security Act because they include fewer conditions than indicated by the statute.  *Stone*, 752 F.2d at 1104-05.  Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Id*. at 1101.  Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."  *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(C) (1984) is used."  *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at *6 (N.D. Tex. Aug. 29, 2001) (Boyle, Mag.).  Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard.  *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).  Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration.  *Stone*, 752 F.2d at 1106.

In this case, the ALJ did not cite or utilize the *Stone* standard because the hearing took place in Arkansas, which is within the Eighth Circuit.  The Eighth Circuit has not adopted the Fifth

15

Circuit's *Stone* standard.  Plaintiff points out that she had moved to Texas by the time she filed an appeal of the ALJ's decision.  She has not presented any authority for her position that the Appeals Council should have remanded the case to the ALJ to utilize the *Stone* standard, and the Court has found none.  Because Plaintiff has failed to demonstrate that the ALJ in Arkansas erred by not utilizing the *Stone* standard, her motion for summary judgment on this ground should be denied.

**D.  Issue Two: Severe Impairments**

Plaintiff next argues that the ALJ failed to consider whether her anxiety, depressive disorder, degenerative disc disease, and angina were severe impairments.  (*See* Pl. Br. at 9-10.)

In the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone*, 752 F.2d at 1101.[2]  Diagnosis alone is insufficient proof of a disability and is merely part of the evidence the ALJ has to consider.  *See Johnson v. Sullivan*, 894 F.2d 683, 685 (5th Cir. 1990).  Furthermore, in addition to demonstrating that she had a severe impairment prior to the date of the ALJ's decision, a claimant also has the burden to demonstrate that the severe impairment lasts for at least 12 months and is severe enough to prevent engagement in any substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  This includes providing objective medical evidence on how her impairments and any related symptoms affect her ability to work.  20 C.F.R. §§ 404.1529(a), 416.929(a).

**1. Anxiety**

Although Plaintiff argues that the ALJ failed to consider her anxiety as a severe impairment, she never claimed anxiety as an impairment in her initial or subsequent reconsideration applications.

---

[2]Although the ALJ in the Eighth Circuit was not required to apply it, *Stone* is binding on this Court.

16

(R. at 173, 203-207, 214-219.)  Plaintiff's medical records from before the hearing demonstrate that

she only occasionally displayed symptoms of anxiousness, and they do not show that she sought

treatment for anxiety.  (R. at 249, 320, 630.)  While she stated at the hearing that she had anxiety

problems, she also testified that she believed she suffered more from depression than from anxiety.

(R. at 34-35.)  "The ALJ's duty to investigate . . . does not extend to possible disabilities that are not

alleged by the claimant or to those disabilities that are not clearly indicated on the record."  *Leggett*,

67 F.3d at 566 (claimant did not allege mental impairments in his application nor before the ALJ).

Moreover, the failure to seek treatment for an alleged disability weighs against a claimant's

credibility on that issue.  *See Clayborne v. Astrue*, 260 F. App'x 735, 2008 WL 41356, at *3 (5th

Cir. Jan. 2, 2008).  The ALJ did not err in considering anxiety as a severe impairment.

### 2. Depression

 The record demonstrates that Plaintiff was not diagnosed with depression prior to the date

of the ALJ's decision, and only on one occasion after the administrative hearing.  (R. at 234-235,

248-249, 259, 281, 319-320, 547, 580, 584, 592, 606, 616-17, 634.)  Further, there is no evidence

of record showing that she sought any treatment for depression prior to the ALJ's decision.  As

noted, the failure to seek treatment for an alleged disability weighs against a claimant's credibility

on that issue.  *See Clayborne*, 2008 WL 41356, at *3.  Although she did present medical evidence

to the Appeals Council demonstrating that she sought treatment for depression one month after the

date of the ALJ's decision, the new evidence of depression or anxiety did not apply to the relevant

time period prior to the ALJ's decision.  (R. at 10-11, 68, 230-231, 390-413.)  The Appeals Council

therefore correctly determined that it would not have changed the ALJ's decision.  Since Plaintiff

failed to meet her burden to demonstrate that she had the severe impairment of depression, the ALJ

17

did not err in considering depression as a severe depression.

### 3. Degenerative Disc Pain

The ALJ also did not err in considering degenerative disc pain as a severe impairment. The record reflects that Plaintiff did not have limitations due to back pain or herniated discs, and that she did not complain of symptoms of disc disease or back pain during several different hospital visits. (R. at 233-260, 280, 318-321, 417-425, 598-606.) The record also reflects that she routinely exhibited normal reflexes and normal muscle tone and coordination with no limitations in her range of motion, no edema, and no nerve or sensory deficit. (R. at 460, 473-474, 500, 509, 511, 538, 590, 592, 606, 634.) The record further reflects that Plaintiff could ambulate without difficulty with a normal gait and station. (R. at 467, 481.) Finally, there is no evidence in the record that she received any treatment for degenerative disc disease or back pain. *See Clayborne*, 2008 WL 41356, at *3. The evidence that she cites here in support of her degenerative disc disease is dated after the administrative hearing and does not show any limitations from her back pain. (R. at 658, 774, 790, 794.) While Plaintiff submitted this evidence to the Appeals Council for review, she did not argue that the ALJ erred by not finding degenerative disc pain as a severe impairment. (R. at 227-238.) The Appeals Council considered the evidence and properly concluded that the information did not provide a basis for changing the ALJ's decision. (R. at 2.)

### 4. Angina

Plaintiff complains that the ALJ erred by failing to consider her angina as a severe impairment. The medical evidence she presented to the ALJ attributed her chest pain to pneumonia and GERD, however, and did not show that she had a severe heart impairment, angina, or cardiac chest pain. Her chest x-rays from her January 8, 2006, hospitalization for chest pain showed that

she had bibasilar interstitial pneumonia. (R. at 280-84, 302.) Her echocardiogram from January 10, 2006, showed that her heart chamber was of normal size with a normal wall motion and normal left ventricular systolic function with a normal ejection fraction that was estimated at 60%; and a small echodense structure in the right atrial cavity which the doctor opined was either a cardiac tumor or an organized intracardiac thrombus. (R. at 294-95.) The doctor recommended a transesophageal echocardiogram for a better assessment of the intracardiac mass. (R. at 295.) A chest x-ray performed on the same day revealed that infiltrates present the day before had resolved with no evidence of acute process, and both a "nuclear ventilation" and "perfusion study" were within normal limits. (R. at 298.) On January 11, 2006, she received a transesophageal echocardiogram that revealed an intracardiac mass with an intra-atrial membrane that was mildly calcified in some areas. (R. at 293.) The doctor noted, however, that the mass was probably an embryonic remnant, was very unlikely to represent either a tumor or an intracardiac clot, and recommended a follow-up echocardiogram in six months. (*Id.*) On May 2, 2006, Plaintiff complained of atraumatic chest pain and was diagnosed with GERD and chest wall pain. (R. at 258-60.) On November 11, 2006, Plaintiff again complained of atraumatic chest pain, and was diagnosed with reflux and chest wall pain, and prescribed Pepcid. (R. at 247, 249, 256-57.)

The ALJ noted that no treating or examining physician placed any limitations on Plaintiff due to her chest pain, giving substantial weight to Dr. Carmack's notation that Plaintiff had a history of pneumonia, had an embryonic intracardiac mass, and that her chest pain was due to GERD and was non-cardiac related. (R. at 260.) *See Perez*, 415 F.3d at 465-66 (the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability). The ALJ properly

19

evaluated Plaintiff's chest pain, found her GERD to be a severe impairment, and incorporated the associated limitations in her RFC. The evidence presented to the Appeals Council confirms the ALJ's finding that Plaintiff's chest pain was caused by GERD. (R. at 417-419, 517, 531.)

Remand is not required on the second issue because Plaintiff failed to meet her burden to show that her anxiety, depression, degenerative disc disease, or angina were severe impairments.

**E. Issue Three: Flawed VE Testimony**

Plaintiff argues that the ALJ relied on flawed VE testimony in making her disability determination because the testimony was produced in response to an improper hypothetical question that did not include all of her limitations borne out by the record. (Pl. Br. at 10-13.) She contends that the ALJ found that Plaintiff had moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace, but did not include those limitations in her hypothetical question to the VE. (*Id.* at 10.)

To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *See Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Id.* at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could

perform available work despite an impairment. *Id*. at 708.

Plaintiff relies on the Seventh Circuit's decision in *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), to support her contention that the ALJ's hypothetical did not include moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace. (*See* Pl. Br. at 11.)  In *O'Connor*, the court found that the ALJ's restriction of the claimant to routine repetitive tasks with simple instructions did not encompass the RFC limitations in concentration, persistence, and pace, or limitations in receiving and responding appropriately to supervisors. *See O'Connor*, 627 F.3d at 617-18.  The court stated, however, that the ALJ may omit limitations in concentration, persistence, and pace when he utilizes alternative language excluding those tasks that someone with the claimant's limitations would be unable to perform. *Id*. at 619-620.  The court explained that ALJ hypotheticals are allowed to stand where they have restricted the claimant to low-stress work or where the conditions underlying the limitations, such as chronic pain syndrome, are mentioned in the hypothetical. *See id.*

Here, the ALJ included the following in the hypothetical question posed to the VE:

> light exertional level, but no climbing of ramps, stairs, stoop, bend, crouch, crawl, kneel, and balance, no sustained driving, no work at unprotected heights or around dangerous equipment or machinery.  Some of these are for protection, some of these because of pain, all in all, the symptomology would support these limits.  The work should be non-complex, simple instructions, little judgment of a routine repetitive type which can be learned by rote, having few variables.  Superficial contact incidental to work with the public and coworkers and supervision which is concrete, direct, and specific.

(R. at 52-53.) Because of the reference to pain and other significant limitations in the last two sentences of the cited language, the ALJ's hypothetical contained the requisite alternative phrasing discussed in *O'Connor*.

Plaintiff also argues that the ALJ's decision runs contrary to the decision in *Voyles v.*

*Commissioner of Social Sec. Admin.*, 2011 WL 825711, at *9 (N.D. Tex. Feb. 16, 2011). In *Voyles*, the ALJ found that the plaintiff had moderate limitations in her ability to maintain concentration, persistence, or pace, but failed to pose the limitations to the VE in the hypothetical question. *Id.* Although the ALJ later asked the VE whether the jobs he identified were "fairly simple, routine, [and] repetitive or involv[ed] simple, routine, repetitive type tasks[,]" the *Voyles* court found that it was still unclear whether the hypothetical encompassed the impairments recognized by the ALJ. *Id.* The ALJ here went beyond what was found inadequate in *Voyles* by including much more restrictive limitations to encompass the moderate limitations in concentration, persistence, and pace: "non-complex, simple instructions, little judgment of a routine repetitive type which can be learned by rote, having few variables; and the moderate limitations in social functioning: superficial contact incidental to work with the public and coworkers and supervision which is concrete, direct, and specific." (R. at 53.) Plaintiff's argument under *Voyles* also fails.

Plaintiff does not state what specific limitations accommodating her moderate limitations in social functioning and concentration, persistence, and pace, the ALJ failed to incorporate into the hypothetical question posed to the VE, and she therefore fails to raise a reversible point of error. *See Bowling*, 36 F.3d at 435. Her motion for summary judgment based on the third issue should also be denied.

**F. Issue Four: Credibility**

Plaintiff alleges that the ALJ improperly evaluated her credibility and only made a conclusory statement that her allegations were not credible. (*See* Pl. Br. at 13-15.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility

since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). SSR 96-7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id*. Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id*. If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and her treating or examining sources concerning the alleged symptoms and their effect. SSR 96-7p, 1996 WL 374186, at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3. The ALJ's evaluation of the credibility

of subjective complaints is entitled to judicial deference if supported by substantial record evidence. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

Although not in a formalistic fashion, the ALJ addressed several of the credibility factors listed in SSR 96-7p in assessing Plaintiff's credibility.  (R. at 75-77.)  She addressed the daily activities factor by discussing Plaintiff's statements on her disability applications and her hearing testimony.  (R. at 75.)  She addressed the duration, frequency, and intensity factors by discussing the  medical evidence related to Plaintiff's allegations of GERD-related pain, chest pain, alleged heart impairment, back pain, herniated discs, arthritis, and depression.  (R. at 75-76.)  With respect to the location, duration, and treatment factors, she stated that there was no objective medical evidence to support these allegations.  (R. at 76.)  In addressing the medication factor, she noted Plaintiff was prescribed medication for GERD, hyperventilation, and bronchitis.  (*Id.*)  With respect to the side effects of medication, she found that Plaintiff had limitations in activities of daily living, social functioning, and concentration, persistence, and pace due to pain, obesity, and the side effects of her medication. (R. at 77.)  She stated that she weighed all the relevant factors and concluded that Plaintiff's subjective complaints did not warrant additional limitations beyond what she found in the RFC assessment.   (R. at 76.)

Plaintiff does not indicate what the ALJ failed to consider in her evaluation and only generally argues that the credibility evaluation was improper and was not supported by substantial evidence.  (*See* Pl. Br. at 13-15.)  Plaintiff must state the reasons she deserves the requested relief "with citation to the authorities, statutes and parts of the record relied on" or else the issue is not properly raised.  *Weaver v. Puckett*, 896 F.2d 126, 128 (5th Cir. 1990); *see also Murrell v. Shalala*, 43 F.3d 1388, 1389 n. 2 (10th Cir. 1994) (perfunctory complaints fail to frame and develop an issue

sufficient to invoke judicial review).

Because a review of the ALJ's credibility assessment reveals that she addressed the applicable factors outlined in SSR 96-7p, remand is therefore not required on this issue as well.

### III.  RECOMMENDATION

Plaintiff's motion for summary judgment should be **DENIED,** the Commissioner's cross-motion for summary judgment should be **GRANTED**, and the final decision of the Commissioner should be **AFFIRMED**.

**SO RECOMMENDED**, **on this 13th day of August, 2012.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

25